UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GAYLE FOLTIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 09-CV-5237 |
| v. ) | |
| ) | District Judge Joan H. Lefkow |
| ARMANDO UGARTE, CESAR CANDELARIO, ) | |
| and the CITY OF CHICAGO, ) | Magistrate Judge Michael T. Mason |
| ) | |
| Defendants. ) | |
| ) | |

To:   The Honorable Joan H. Lefkow
      United States District Judge

## REPORT AND RECOMMENDATION

Michael T. Mason, United States Magistrate Judge.

The District Court has referred this matter to this Court for all discovery motions
and discovery supervision [61].  Currently pending before this Court is plaintiff's Motion
for Sanctions Pursuant to Rule 37 [121].  In short, plaintiff asserts that defendants'
failure to identify the female police officer who searched her on August 14, 2009
warrants, among other things, the dispositive relief of striking the entirety of defendants'
answers to her complaint.  For the reasons set forth below, we respectfully recommend
that the District Court grant plaintiff's motion in part and deny it in part.

## BACKGROUND

The following summary is taken from various pleadings and briefs filed by the
parties, as well as the August 25, 2011 declaration of defense counsel and attorney of
record Shneur Nathan, of Andrew M. Hale & Associates, LLC.  Unless otherwise noted,
the parties do not materially dispute the following.

On August 14, 2009, at approximately 11:00 pm, defendants Armando Ugarte and Cesar Candelario, police officers with the Chicago Police Department ("CPD"), made a traffic stop of a car driven by Donald Angona.[1]  Plaintiff Gayle Foltin ("plaintiff" or "Foltin") was a passenger in that car.  The parties agree that Candalario asked plaintiff to get out of the car, that plaintiff cooperated, and that while she was standing outside of the car, one or more marked police cars arrived at the scene.  The parties also agree that one of those cars contained at least one female Chicago Police Officer, and that she searched plaintiff and then left the scene.  Plaintiff alleges that this female officer subjected her to an intrusive and unnecessary body cavity search.  Defendants Ugarte and Candelario admit that an unknown female officer did a "protective pat-down search" of plaintiff but otherwise largely deny her allegations.

Plaintiff and Angona were not charged with any crime and were not issued any citation as a result of the stop.  Defendants assert that they left the scene because they were in hot pursuit of a suspected vehicular hijacker.  Plaintiff's Third Amended Complaint, filed on June 30, 2011, alleges that defendants violated 42 U.S.C. §§ 1983 and 1988, and contends that defendant "City of Chicago has a practice/policy of conducting highly intrusive searches of women during the course of a *Terry* stop." (Third Am. Compl. ¶ 10 [104].)

For some time now, at least as early as December 2009, plaintiff has been trying to determine the identity of the female police officer who searched her.  Prior to August 2, 2011, defendants' efforts to identify the female officer who searched plaintiff

---

[1] Angona was previously a plaintiff but requested to be dropped from the case in June 2011. (Pl.'s Mot. for Leave to File a Third Am. Compl. ¶ 1 [101].)

consisted of the following:

- the CPD's "Internal Affairs Division ('IAD') had contacted plaintiffs Gail Foltin and Donald Angona through counsel "to obtain their cooperation in the identification process elected not to cooperate [sic]";

- In June 2010, defendants provided a photo array of female officers to plaintiff, after which plaintiff apparently identified a female officer, Jacklyn Owsiniak, as the one who searched her[2];

- the parties deposed then-plaintiff Angona, defendants Ugarte and Candelario (who testified that they were unable to name the officer who searched plaintiff, as she was from a different District), plaintiff (who testified that she believed Owsiniak was the name of the officer who searched her), and Owsiniak[3];

- defendants reviewed records from the Office of Emergency Management and Communications, including audio recordings and computer printouts;

- defendants reviewed Attendance and Assignment Sheets for the "relevant time period" from Districts 3, 4, 5, 6, and 22, and Units 153 and 253; and

- defendants conducted a "Contact Card Search for Gail Foltin and Donald Angona."

(Nathan Decl. ¶ 7 [128].)

On April 27, 2011, plaintiff served a Rule 30(b)(6) deposition notice on

defendants seeking to depose someone with knowledge of, among other things, (1) the

names of any CPD officer present at the traffic stop, and (2) the name of the female

police officer.  In response, defense counsel Shneur Nathan repeatedly told plaintiff's

counsel Thomas Morrissey in June and July 2011 that after reviewing all available

---

[2] At a August 17, 2011 hearing before this Court, the parties' counsel disputed whether the photo array shown to plaintiff was limited to female officers on duty the night of the incident in the CPD District where the incident occurred (6th) and certain surrounding Districts, or whether that array included off-duty officers as well.

[3] Plaintiff has since determined that Owsiniak was not the officer who searched her, and dropped Owsiniak as a defendant in subsequent versions of her complaints.

3

police records and communications tapes, defendants were unable to identify the name of the female officer.  On August 2, 2011, plaintiff filed a motion to compel defendants' production of a 30(b)(6) witness with knowledge of the above topics [111].  Plaintiff argued time was of the essence because the two year statute of limitations related to the August 14, 2009 incident would be expiring soon.

After reviewing defendants' response [116] and holding a hearing on the motion on August 9, 2011, we granted plaintiff's motion and ordered defendants "to appropriately and thoroughly investigate the identity of the unknown female police officer who searched plaintiff Foltin on the date of the incident in question" [117]. Among other things, we ordered defendants to provide plaintiff's counsel with the name(s) of a Rule 30(b)(6) deponent with knowledge of defendants' investigation and its results by August 12, and directed the parties to schedule that deposition at a mutually convenient time prior to the close of fact discovery on September 12, 2011.

At a status hearing on August 11, 2011, the parties reported on their ongoing efforts to locate the unknown female officer in response to our order.  Among other things, defense counsel Nathan indicated he was working with Lieutenant David Naleway from the Internal Affairs Division of the CPD, who supervises investigations focused on identifying unknown officers.  Apparently, on August 10, 2011, Naleway told Nathan that Nathan had done everything Naleway could think of to locate the unknown officer other than order a "name check."  According to defendants, a "name check" is "not a document kept in the ordinary course of business.  Rather, it is a document created collaboratively by the Office of Emergency Management and Communications ("OEMC") and an independent computer consultant by investigating whether an officer

4

ran a name or a plate in his or her in-car computer and creating a memorandum regarding the results of the search." (Dfs.' Resp. to Pl.'s Mot. for Sanctions ¶ 14 [123].) Evidently, Nathan had not previously known about the "name check option," and immediately requested that it be done on an expedited basis.

Defense counsel produced the name check results to plaintiff's counsel just before Naleway's deposition as defendants' Rule 30(b)(6) representative on the morning of August 12, 2011. The name check was conducted on the license plate of Angona's car. Notably, according to defendants, both Angona and plaintiff stated in their interrogatory responses and their depositions that they were driving *Foltin's* car on the night of the incident. (*See* Jt. Status Rep. ¶ 11 [141].) In any event, the name check revealed that Officer Jimmy Guerra was present at the scene and that he conducted a license plate inquiry at 11:07 pm.

By analyzing the name check against certain Attendance and Assignment Sheets, counsel determined that Guerra was partnered with Officer David Noto and was working on Beat 2261D that evening. While no female officers were assigned to that beat according to the Attendance and Assignment sheets, Officer Gina Jones was assigned to Beat 2261A that evening, along with Officers David Bachler and Michael Sweeney. As a result, counsel identified Jones as an officer of interest. Naleway confirmed these conclusions at his deposition, and also identified two other female officers from Unit 253 as officers of interest because the Attendance and Assignment Sheets showed them each partnered with two male officers. For reasons not apparent on the record before us, it appears plaintiff's counsel opted not to explore further whether either of those other two female officers was the one who searched plaintiff.

5

After Naleway's deposition, plaintiff's counsel Kenneth Flaxman told defense counsel he would like to depose Guerra, Noto, and Jones the following Monday, August 15, 2011. At 4:35 pm on August 12, defense counsel Nathan wrote plaintiff's counsel Morrissey that "I [Nathan] did notify" Jones, Guerra, and Noto to be present at his office for their depositions at 9:30 am on August 15, and "hope all of them will be able to make it." (Pl.'s Mot. for Sanctions at Ex. H [121-8].) Nathan also wrote that those officers would be represented by another attorney, Derek Payette, and that the depositions would be limited to questions about whether those officers were present at the scene and whether they know who the unidentified female officer is "because there is insufficient time for Derek to prepare his clients for full blown depositions." (*Id.*)

According to Nathan's declaration, defense counsel and attorney of record Jonathan Boulahanis issued the August 12 "notification" to Jones, Guerra, and Noto to come to counsel's office on August 15 for their depositions. (Nathan Decl. ¶ 27.) That notification consisted of Boulahanis sending a fax on the afternoon of Friday, August 12 to the CPD's Subpoena Entry Unit stating that the officers were to appear on Monday morning, August 15. According to Nathan's declaration, this is the "standard procedure" used to notify Chicago Police Officers to be present in court or at an attorney's office. (*Id.*) Nathan also called the secretary at the Watch Commander's office at the Twenty-Second District to make sure the notifications were forwarded from the Subpoena Entry Unit. (*Id.* ¶ 29.) According to Nathan, the woman who answered the phone confirmed that the Twenty-Second District had received the notifications from Nathan's office. (*Id.*) Either Nathan or Boulahanis also asked Sweeney and Bachler to come in the morning of August 15, in the hope that those Officers might be able to provide useful information

6

if Guerra, Noto, or Jones did not receive their notifications.  (*Id.* ¶ 28.)  It appears that defendants, their counsel, and Payette did not make any effort to contact Jones, Guerra, or Noto directly, whether at home, on their cell phones, or otherwise, regarding their depositions prior to their scheduled start time on the morning of August 15.

On August 15, Sweeney arrived at Nathan's office but Guerra, Noto, and Jones did not.  Nathan then notified plaintiff's counsel that Guerra, Noto, and Jones would not be presented for their depositions that day, but produced Sweeney.  Plaintiff's counsel Morrissey, who was out of town on vacation, participated in that deposition by telephone.  Sweeney testified that he was on patrol August 14, 2009 in an unmarked vehicle with Jones, and described her as a very tall, middle-aged woman, which, according to plaintiff, "provided some evidence that she was not the officer who searched Ms. Foltin."  (Pl.'s Mot. for Sanctions ¶ 13.)  Sweeney also testified that he had no recollection of traveling to the vicinity of 83rd and Cottage Grove on the evening of August 14, 2009.  Further, Sweeney stated that Guerra would not have received defense counsel Nathan's deposition notification because Guerra was retired.

At the conclusion of Sweeney's deposition, plaintiff's counsel Morrissey asked defense counsel Nathan to try to locate Jones and Noto on an expedited basis and produce them for their immediate depositions later that day.  Morrissey advised Nathan and Payette that Morrissey would be traveling by plane between 3:30 and 6:30 pm that day, but would be available thereafter and until 11:00 pm that evening.  Defense counsel agreed to attempt to make those officers available.  Both Payette and Nathan made repeated attempts that afternoon to reach Noto and Jones.  They learned that Noto was on medical leave, had only limited availability the remainder of that afternoon,

7

was unavailable that evening, and was scheduled to have a surgical procedure done on Thursday. Their attempts to speak with Jones that day were unsuccessful.

At 3:56 pm on August 15, Payette sent a letter to plaintiff's counsel Morrissey via email agreeing to make photographs of Jones, Guerra, and Noto immediately available to plaintiff to determine if she recognized any of them, and asked plaintiff's counsel to contact Payette's colleague by 6:00 pm that day if interested. However, at the time that email was sent, Morrissey was traveling by airplane. Payette and Morrissey spoke at approximately 4:48 while Morrissey was on layover and Morrissey told Payette that plaintiff would not be available to participate in a photo array that evening. Payette informed Morrissey that Noto was unavailable to be deposed that evening, but Payette was still attempting to contact Jones. Shortly thereafter, Payette learned that plaintiff had filed a lawsuit against Guerra, Noto, and Jones. That lawsuit also arises out of the August 14, 2009 incident, and alleges that Jones "or some other female police officer" searched plaintiff at the direction of Guerra and/or Noto. (Case No. 11-5543, Compl. ¶ 9 [1] (Lefkow, J.).) Payette then left Morrissey a voice mail at approximately 5:34 pm stating that Jones, Guerra, and Noto would not be produced for their depositions that evening.[4]

On August 16, plaintiff filed a "motion for sanctions pursuant to Rule 37" [121]. Plaintiff's motion asks the Court to award her reasonable expenses (including attorney's fees) incurred in bringing both her motion to compel and her pending motion for sanctions, and to strike defendants' answer to paragraph 11 of the Third Amended

---

[4] Plaintiff's counsel Morrissey had a recording of that voice mail played into the record during the August 17, 2011 status hearing before this Court.

Complaint.[5]   Alternatively, she asks that defendants be barred from presenting any evidence from the unknown female police officer.  Later that day, defendants filed their response [123], and early the next day, plaintiff filed her reply [124].

On August 17, the parties again appeared before this Court for a status hearing. They reported on defendants' continued investigation into the identity of the unknown female police officer, as well as plaintiff's filing of a separate lawsuit against the three other recently-identified police officers.  During that hearing, we ordered defendants to file a declaration detailing each step taken, between August 2, 2011 through August 16, 2011, by defendants, their counsel, and anyone working on their behalf to identify the unknown officer and any other individual who might have knowledge of her identity, and to coordinate access to those individuals and information they might have with plaintiffs' counsel.  On August 24, Jones and Guerra apparently sat for their depositions in this matter.  Guerra testified that he was out of town for about a month and a half and had only returned home on August 22.

As noted above, in response to our August 17 order, defendants filed the declaration of Shneur Nathan on August 25.  On August 30, plaintiff filed an unsolicited "response" to that declaration [129].  In that response, plaintiff requests for the first time

---

[5]  Paragraph 11 of Plaintiff's Third Amended Complaint states: "In accordance with the City of Chicago's policy/practice, the unidentified police officer proceeded to conduct a highly invasive search of plaintiff which included reaching under and pulling on the bra.  Next, the female officer inserted fingers into the body cavities of plaintiff.  No drugs or weapons were recovered by defendants."  Defendants' answer to that paragraph states: "Defendants admit that no drugs or weapons were recovered.  Defendants lack sufficient knowledge or information from which to either admit or deny the truth or falsity of whether the unknown female officer performed a search in the manner described in paragraph 11.  Responding further, Defendants deny that that the type of search described in paragraph 11 is in accordance with any policy or practice of the City of Chicago."  (Answer to Third Am. Compl. ¶ 11 [114].)

that we strike the entirety of defendants' answers to the complaint, or that the jury be given an adverse inference instruction regarding defendants' inability to produce the female police officer.[6]  After reviewing the parties' filings regarding plaintiff's motion for sanctions, as well as Nathan's declaration and plaintiff's response, this Court could find no indication as to whether Gina Jones was in fact the previously unknown female police officer who searched plaintiff on August 14, 2009.  As a result, we ordered the parties to file a joint status report setting forth their respective positions regarding that issue [138].

According to the parties' status report, the parties agree that Gina Jones is not the female officer who searched plaintiff.  (Jt. Status Rep. ¶ 2 [141].)  According to defendants, Sweeney, Jones, and Guerra all stated in their depositions that "they did not recall encountering the Plaintiff or assisting in a traffic stop" on August 14, 2009.  (Id. at n. 1.)  Additionally, Jones' physical characteristics (5'11" to 6' tall, approximately

---

[6]  Plaintiff also contends Nathan's declaration fails to adhere to our August 17 order because Nathan lacks personal knowledge of attorney Derek Payette's efforts between 11:25 am and 4:05 pm on August 15, 2011 to locate Officers Jones and Noto, and of Payette's conversations with plaintiff's counsel Morrissey.  (Pl.'s Resp. to Nathan Decl. at 2-3 [129].)  She also complains that defendants Ugarte and Candelario did not file a declaration regarding their investigative efforts.  (Id. at 2.)  However, our August 17 order did not require every attorney involved in defendants' investigation, or any of the defendants individually, to each file a declaration [126].  The matter pending before this Court concerns whether sanctions for alleged discovery misconduct – not summary judgment or another merits-based decision – is appropriate.  Further, Nathan is the designated trial attorney in this matter, is a member of this Court's trial bar, and, as shown during his many appearances before this Court, has clearly taken the lead in coordinating defendants' efforts to locate the unknown female officer.  We have no reason to doubt the veracity of his summary of those efforts.  Notably, plaintiff does not contend that Nathan's declaration incorrectly describes Payette's interactions with Morrissey on August 15.  Additionally, Nathan stated during the August 17 hearing that he was present for one of Payette's phone calls to Jones.  Finally, whether or not Nathan has personal knowledge of Payette's actions during that time period does not materially impact our analysis and recommendations herein.

160-185 pounds, long brown hair and light skin/fair complexion) do not match the physical description plaintiff gave of the officer who searched her (5'3 to 5'5" tall, approximately 115-125 pounds, petite, with facial features that appeared to be either Caucasian or Latino). The parties have discussed conducting a viewing of Jones' photograph at CPD headquarters, but "do not feel it is necessary based on their investigation already conducted." (*Id.* ¶ 7.)

According to "Defendants' Position" in the status report, Sweeney, Jones, and Guerra all stated in their depositions that they did not recall encountering plaintiff or assisting in a traffic stop. Defendants state that Noto has not been deposed, as he is on medical leave following artery bypass surgery and "is currently recovering and unable to sit for a deposition." However, defendants state, without explanation, that "it is expected that [Noto's] deposition testimony would not materially differ from his partner that evening, Officer Jimmy Guerra." (Jt. Status Rep. ¶ 10 n. 1.) Finally, defendants state they have no knowledge of other avenues to explore to identify the still-unknown officer.

For her part, plaintiff contends that defendants are making inconsistent statements regarding whether Jones was the officer who searched her.[7] Plaintiff also asserts that defendants do not appear to have contacted Ugarte or Candelario to see if their memory concerning the missing female officer could be refreshed given recent

---

[7] As support, plaintiff cites two pages of defendants' reply in support of their motion to bifurcate, currently pending before the District Court. There, defendants argue that Seventh Circuit precedent holds that personal liability is a prerequisite to plaintiff's *Monell* claim, and therefore, "[u]nless the jury believes that Officer Jones performed a search on Plaintiff in an unreasonable manner, it would be *inconsistent* to find liability against the City for that very same search." (Dfs.' Reply at 5-6 [139] (emphasis in original).) We decline to attempt to interpret the accuracy or implication of a legal argument made in a brief not pending before us, particularly in light of defendants' unequivocal factual representation to this Court that Jones is not the female officer who searched plaintiff.

developments, and that the officers have not been shown a photo array of the female officers assigned that night in the vicinity of the incident to see if identification possibly could be made. Plaintiff also takes issue with defendants' assumptions that Noto's testimony would be similar to his partner's and thus there is no need to even contact him to see if he could shed any light on the officer's identity.

## DISCUSSION

As noted above, plaintiff seeks a variety of sanctions from this Court. Initially, she asked this Court to award her attorney's fees pursuant to Rule 37(b)(2)(C), and to strike paragraph 11 of defendants' answer to her most recent complaint pursuant to Rule 37(b)(2)(A)(iii), or alternatively, to bar defendants from presenting any evidence from the unknown female police officer. In her response to Nathan's declaration, plaintiff asks that this Court strike the entirety of defendants' answer, or alternatively require that the jury be instructed that they may draw an adverse inference from defendants' inability to produce the female officer.

Courts have the inherent power to impose sanctions for abuse of the judicial system. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991); *Barnhill v. U.S.*, 11 F.3d 1360, 1368 (7th Cir. 1993); *Danis v. USN Communications, Inc.*, No. 98-7482, 2000 WL 1694325, at *30 (N.D. Ill. Oct. 20, 2000). The power is not based in rule or statute, but rather in the ability of the courts to manage their own dockets and ensure the expeditious resolution of cases. *Barnhill*, 11 F.3d at 1367 (*citing Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962)). Courts also have the statutory authority, under Federal Rule of Civil Procedure 37, to sanction a party for discovery abuses. Fed. R. Civ. P. 37(b). Notably, Rule 37(b)(2) sanctions are available only where a court order or

discovery ruling of some sort has been violated. *See Brandt v. Vulcan, Inc.*, 30 F.3d 752, 756 n.7 (7th Cir. 1994). However, whether or not a party's conduct is sanctionable under any subdivision of Rule 37 is an academic issue, as the analysis for imposing sanctions under that Rule or our inherent power is "essentially the same." *Danis*, 2000 WL 1694325, at *30 (*quoting Cobell v. Babbit*, 37 F. Supp. 2d 6, 18 (D.D.C. 1999)); *accord Porche v. Oden*, No. 02 C 7707, 2009 WL 500622, at *5 (N.D. Ill. Feb. 27, 2009).

Courts have broad discretion to choose an appropriate sanction for discovery misconduct based on the unique facts of every case. *Danis*, 2000 WL 1694325, at *31 (*citing National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642 (1976)). The Seventh Circuit requires that any sanctions rendered be proportionate to the offending conduct, and that harsh sanctions such as default be reserved for extreme circumstances. *Collins v. Illinois*, 554 F.3d 693, 696 (7th Cir. 2009); *Barnhill*, 11 F.3d at 1367. The striking of pleadings often has the same practical effect as a default judgment, and thus should also be reserved for extreme circumstances. *See, e.g.*, *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366, 1371 (11th Cir. 1997) (noting that striking a defendant's pleadings and entering a default in the Rule 37 context is an "extreme sanction" that is only justified by conduct that is intentional or in bad faith). Additionally, bad faith is required for a court to grant an adverse inference sanction. *See Fass v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008) *Cf. Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008) (noting generally that "a showing [of bad faith] is a prerequisite to imposing sanctions for the destruction of evidence," but citing as support cases addressing appropriateness of adverse

13

inferences).  However, depending on the sanction imposed, "fault" – as opposed to bad faith – may form a sufficient basis for sanctions.  *Marrocco v. General Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992); *Jones v. Bremen High School Dist. 228*, No. 08-3548, 2010 WL 2106640, at *5 (N.D. Ill. May 25, 2010).  "Fault" does not speak to the noncomplying party's disposition, but describes only the reasonableness of the conduct – or lack thereof – that eventually resulted in the violation.  *Marrocco,* 966 F.2d at 224; *Langley v. Union Elec. Co.*, 107 F.3d 510, 514 (7th Cir. 1997).

As set forth by the authorities above, sanctions for discovery misconduct should be narrowly tailored to ameliorate any potential prejudice to plaintiff, deter others from similar conduct, and punish defendants for any harm caused by their behavior.  We conclude that the majority of the sanctions requested by plaintiff are not appropriate here, but that some sanctions, in the form of a monetary penalty and additional discovery, are warranted.  As a result, we respectfully recommend that the District Court grant plaintiff's motion in part, and deny it in part.  The reasons for our recommendation are as follows.

First, we find that plaintiff has not established the level of fault – willfulness or bad faith – required to justify striking all or part of defendants' answer or to provide the adverse inference jury instruction.  "Wilfulness" and "bad faith" are characterized by conduct which is either done intentionally, for the purpose of hiding adverse information, or in reckless disregard of a party's obligations to comply with a court order.  *Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 1997); *Marrocco,* 966 F.2d at 224; *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998).  However, defendants' conduct since our August 9 order does, for the most part, demonstrate sincere and

14

concerted efforts to identify the unknown officer. Among other things, defense counsel brain-stormed with Naleway, had a name check conducted – on a vehicle different from the one plaintiff asserts was stopped – on an expedited basis, produced Naleway for his deposition, identified several other officers of interest, and produced yet another officer (Sweeney) for his deposition.

It is unfortunate that the female officer has still not been identified. However, that failure does not establish that defendants have not complied with this Court's August 9 order, or that the extreme sanctions sought are warranted. Our order did not require defendants to actually identify the unknown female police officer, as plaintiff contends, but to "appropriately and thoroughly investigate [her] identity." Further, the fact that the officer has still not been identified may be the result of defendants' failure to flesh out a few remaining avenues of investigation (more on that below). But it may also result from the CPD's apparent failure to keep more detailed records of its officers' whereabouts, as well as the individual defendants' apparent acquiescence in having a CPD officer evidently unknown to them search an individual under a *Terry* stop. Ultimately, however, plaintiff has introduced no evidence – much less argued – that the CPD's methods for tracking its officers' whereabouts, or the individual defendants' asserted failure to learn the female officer's name, violates defendants' obligations to preserve evidence under the Federal Rules of Civil Procedure or applicable precedent. But for the few additional tasks set forth below, we find that defendants have substantially complied with our August 9 order. As a result, we conclude that defendants have not acted with the requisite willfulness or bad faith to justify the striking of all or part of their answer, or the giving of an adverse inference jury instruction.

15

However, we agree with plaintiff that prior to our August 9 order, defendants' efforts to identify the missing female officer were less than appropriately diligent. Further, we do not credit defendants' attempt to shift the blame for its conduct prior to that point to plaintiff, based on her (apparently incorrect) identification of Owsiniak as the officer in question. Plaintiff recanted that identification and – beginning as early as her April 2011 Rule 30(b)(6) deposition notice – reiterated her desire to continue investigating the officer's identity. Defendants failed to meaningfully respond – other than to reiterate their prior efforts to identify the officer – until August, after plaintiff moved before this Court to compel defendants' compliance with her deposition notice. Defendants offer no explanation to this Court for that failure. We find defendants' silence on the issue to be telling, given that, within three days of our ordering defendants to conduct a thorough investigation, defendants identified three additional officers who appear to have been at the scene of the incident. We also fail to understand why defendants, their counsel, or Payette did not exert greater efforts to contact Noto, Guerra, or Jones regarding their depositions prior to August 15, such as by attempting to contact them at home or on their cell phones on August 12, 13, or 14. Ultimately, however, we are not convinced that this conduct establishes that defendants intentionally sought to hide the unknown officer's identity from plaintiff, or acted in reckless disregard of their obligation to attempt to identify that officer.

Second, we conclude that plaintiff has failed to establish that the prejudice resulting from the officer remaining unidentified warrants the extreme sanctions she seeks. While prejudice is not required to impose sanctions, *Barnhill*, 11 F.3d at 1368, the prejudice to the non-offending party should be considered by the court when

16

determining the appropriate penalty for discovery misconduct. *Marrocco*, 966 F.2d at 225. In cases that do not involve wilfulness or bad faith, courts often use prejudice as a "'balancing tool' to tip the scales in favor of or away from severe sanctions." *Larson*, 2005 WL 4652509, at *13 (*quoting Danis*, 2000 WL 1694325, at *34).

Here, plaintiff contends – and defendants do not dispute – that the statute of limitations has expired as to any claim plaintiff might bring against the unknown officer individually. While the parties do not discuss the limitations issue in any detail, it appears that plaintiff is correct on this point. The liability rules under 42 U.S.C. § 1983 provide that a local government is not liable for the wrongful actions of its officers and employees unless those actions resulted from an established policy or custom. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). In the absence of such a policy or custom, a plaintiff must sue the officers individually, in their own names. If a plaintiff does not know the officers' names, she can proceed by filing a complaint against unidentified officers, and later amending the complaint when their real names are discovered. But because the amendment does not "relate back" to the date of the original pleading, *see* Fed. R. Civ. P. 15(c); *Delgado-Brunet v. Clark*, 93 F.3d 339, 344 (7th Cir. 1996), the officers' names must be added before the relevant statute of limitations expires – two years for Illinois claims under § 1983, *Clark v. City of Braidwood*, 318 F.3d 764, 766 (7th Cir. 2003). While plaintiff's most recent complaint asserts a *Monell* claim against the City, she also previously sought to assert a § 1983 claim against the individual officer who searched her. (Third Am. Compl. ¶¶ 10, 11; Am. Compl. ¶¶ 8, 9 [17].) Ultimately, the time by which plaintiff could have named that officer expired August 15, 2011, two years after the August 14, 2009 search. As a

17

result, even assuming the female officer's identity is somehow disclosed at some point in the future, plaintiff may be unable to amend her complaint to name that officer as a defendant.[8]  However, plaintiff does not cite any authority – and we can find none – indicating that such an unfortunate situation warrants the relief she currently seeks.

As for plaintiff's argument that the officer's unavailability "may advance the defendants' trial strategy by portraying Ms. Foltin as a liar who is pursuing a civil suit against defendants solely for monetary gain" (Pl.'s Resp. to Nathan Decl. at 13), learning the female officer's identity would by no means assure that a jury would credit plaintiff's version of events.  That officer could, among other things, deny that she submitted plaintiff to the search she describes.  Additionally, a jury might just as conceivably hold the female officer's absence against defendants instead of plaintiff. Defendants admit that an unknown officer patted plaintiff down but dispute the search's scope and whether they authorized it.  A jury could reasonably conclude that defendants' failure to identify the officer indicates they have something to hide. However, we do find that plaintiff has suffered some prejudice as a result of defendants' conduct.  As noted above, defendants' failure in the spring and early summer of 2011 to renew their investigation into the officer's identity forced plaintiff to file a motion to compel before this Court.  According to his declaration, plaintiff's counsel Morrissey spent a total of 2.7 hours (at a rate of $535 per hour, for a total of $1,444.50) between

_____

[8]  We say "may be unable," because "[t]he doctrine of equitable tolling allows a plaintiff in some instances to file a claim after the statute of limitations has expired, but only if she was unable to do so earlier despite the exercise of 'reasonable diligence.'"  *Hines v. City of Chicago,* No. 03-1595, 91 Fed. Appx. 501, 502 (7th Cir. Jan. 21, 2004) (citations omitted).  However, we express no opinion as to whether such a doctrine might apply here in the event the officer's identity is discovered.

August 2 and 9, 2011 communicating with defense counsel and then drafting and appearing on plaintiff's motion to compel.  (Pl.'s Mot. for Sanctions at Ex. J [121-10].[9])  As also noted above, defendants failed to take sufficient reasonable steps to contact Jones, Guerra, and Noto before August 15 to ensure they had notice of their depositions scheduled for that morning.  That failure contributed to the need for plaintiff to file a separate lawsuit – and incur an additional $350 filing fee – against those officers before the limitations statute expired on August 15.  However, that lawsuit may not have been necessary, given the parties' subsequent discovery that Jones is not the female officer who searched plaintiff.  As a result, we recommend that the District Court award plaintiff a total of $1,794.50 in fees and costs.

Additionally, we agree with plaintiff that some (albeit minor) avenues of investigation remain to be exhausted, and a supplementation of one of defendants' discovery responses is warranted.  As a result, we respectfully recommend that the District Court re-open fact discovery (which closed on September 12, 2011 [109]) for the following limited purposes:

- to show a photo array of female police officers on duty in the vicinity and at the time of the August 14, 2009 incident to plaintiff, defendant Ugarte, defendant Candelario, Jones, Noto, Guerra, Bachler, and Sweeney (such array and questioning to be done in a manner mutually agreeable to plaintiff's counsel and defense counsel);

- to reopen the depositions of defendants Ugarte and Candelario so that plaintiff may question each regarding whether the identification of Jones, Noto, and Guerra – or any other recent developments – refreshes their

---

[9]  Plaintiff seeks a total of $5,082.50 in fees in her counsel's declaration.  However, we conclude that an award of fees greater than $1,444.50 would be inappropriate, as it would encompass fees for work plaintiff's counsel would have had to conduct regardless of whether defendants had recommenced their investigation in a more timely manner.

memories regarding the identity of the unknown female police officer; and

• for Noto to be deposed as soon as practicable following his recovery for artery bypass surgery (or if his recovery is not imminent, for his deposition upon written questions to be provided by plaintiff's counsel).

Finally, in light of the possibility – however slim – that the unknown officer's identity might be discovered prior to the start of trial, we refuse to recommend that the District Court grant plaintiff's single-sentence request that defendants be barred "from presenting any evidence from the unknown female police officer." In the event the officer's identity is discovered, plaintiff may file a motion regarding how any evidence that officer might provide ought to be treated. However, we strongly urge the parties to meet and attempt to agree on how best to proceed in the interests of justice should the officer's identity be discovered before trial of this matter.

## CONCLUSION

For the foregoing reasons, we respectfully recommend that plaintiff's Motion for Sanctions Pursuant to Rule 37 [121] be granted in part and denied in part. Specific written objections to this Report and Recommendation may be served and filed within fourteen (14) days from the date that this order is served. Fed. R. Civ. P. 72. Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the Report and Recommendation. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

ENTERED:

MICHAEL T. MASON
United States Magistrate Judge

Dated: October 12, 2011