**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GAYLE FOLTIN, | ) <br> ) |
| Plaintiff, | ) <br> ) <br> ) No. 09 CV 5237 |
| v. | ) <br> ) Judge Joan H. Lefkow |
| POLICE OFFICER ARMANDO UGARTE, POLICE OFFICER CESAR CANDELARIO, CITY OF CHICAGO, | ) <br> ) <br> ) <br> ) |
| Defendants. | ) <br> ) |

**OPINION AND ORDER**

Plaintiff Gayle Foltin brings this action under 42 U.S.C. § 1983 against defendant police officers Armando Ugarte and Cesar Candelario ("the defendant officers") and the City of Chicago ("the City") alleging that defendants violated her Fourth Amendment rights by conducting an unlawful search of her person on August 14, 2009.[1] Foltin now moves for partial summary judgment under Federal Rule of Civil Procedure 56, arguing that she was searched without reasonable suspicion and, alternatively, that the search exceeded the permissible scope of a pat-down search under *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).[2] For the reasons set forth herein, Foltin's motion (#156) will be granted as to liability.

---

[1] Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

[2] Foltin asserts but one claim against the officers. Proceedings on her *Monell* claim have been stayed pending disposition of this motion. The City has agreed to entry of judgment against the City to compensate her for an award of damages against the defendant officers. (*See* Dkt. #132, 154.)

**LEGAL STANDARD**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c) & advisory committee notes (1963 amend.). While the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), where a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id.* at 323. In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).

**BACKGROUND**[3]

On August 14, 2009, Officers Ugarte and Candelario were working as patrol officers assigned to the 4 p.m. to 12 a.m. shift in the City's Sixth Police District, which Officer Candelario describes as a high crime area. Around 11 p.m., Officer Ugarte noticed a vehicle make an improper lane change. The vehicle belonged to Foltin. Don Angona was driving the car and Foltin was a passenger. Officer Ugarte activated his emergency lights. The vehicle did not immediately pull over but proceeded approximately six car lengths before abruptly pulling over between 81st and 83rd and Cottage Grove Avenue.[4]

---

[3] The following facts are derived from the parties' statements of fact to the extent that they comply with Federal Rule of Civil Procedure 56 and Local Rule 56.1. Foltin previously moved to strike a number of defendants' responses to her statement of facts; a motion that the court denied without prejudice noting that such motions are disfavored. (Dkt. #176.) Nevertheless, some of defendants' responses are improper and will be stricken. Specifically, defendants' responses to paragraphs 31 and 32 of Foltin's statement of facts fail to make "specific reference[ ] to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B). These facts are therefore deemed admitted. *See, e.g., Smith* v. *Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission."). Additionally, defendants admit the facts contained in paragraphs 24, 35, 36, and 37 but attempt to include additional information in their responses. This is improper and these responses will be deemed admitted without reference to any additional information. *See Buttron* v. *Sheehan*, No. 00 C 4451, 2003 WL 21801222, at **4–5 (N.D. Ill. Aug. 4, 2003). As for paragraphs 20, 21, 25, 26, the evidence cited by defendants does not directly contradict Foltin's factual statements and these paragraph are admitted. *See id.* at *5. As for the evidence put forth by Foltin, paragraph 6 of Foltin's statement of facts does not support the time period in the statement and this portion of the paragraph will be disregarded. Finally, as for defendants' statement of additional facts, the testimony cited by Foltin does not contradict the statement contained in paragraph 9 and this paragraph is admitted.

[4] Officer Ugarte testified that Angona traveled about "six car lengths," taking "seconds" from the point that he first attempted to curb the vehicle to the time the vehicle pulled over, although space to pull over was available sooner. (Dkt. #162, Ex. 1, Ugarte Dep. 30: 18-20; 34:19–23.) Officer Ugarte stated that traffic was "heavy." (*Id.* 24: 22.) Although he did not recall how fast the car was moving, he described it as "normal driving." (*Id.* 27:17–19.) Officer Candelario testified that Angona was in the east lane, thus requiring him to cross a lane of traffic in order to pull over. (Dkt. #162, Ex. 3, Candelario Dep. 59.) (According to answers.com, a car travels 44 ft./sec. at 30 mph and an average sedan measures 13.5 feet. Thus, approximately 6 car lengths would have passed in about two seconds.)

While attempting to curb the vehicle, Officers Ugarte and Candelario observed Angona and Foltin making "furtive movement[s]" in the car. (Dkt. #162, Ex. 3, Candelario Dep. 32:20–33:8; Dkt. #162, Ex. 3, Candelario Dep. 53:3–11.) Officer Ugarte observed Angona lift his body up and then go back down, and he observed Foltin moving sideways. (Dkt. #162, Ex. 1, Ugarte Dep. 33:9–13; 34:9–14.) Officer Candelario observed Angona move his shoulders side to side and up and down and observed Foltin moving in the same manner. (Dkt. #162, Ex. 3, Candelario Dep. 53:16–22; 54:22–55:1.) The officers could not see the occupants' hands from their vantage point behind the vehicle. After witnessing these movements, Officer Candelario immediately became concerned for his safety. (*Id.* at 57:19.)

Once the vehicle was curbed, Officer Ugarte approached the driver's side of the car and Officer Candelario approached the passenger's side. The car was filled with garbage and debris. Officer Ugarte observed a flat and square object on the vehicle's floorboard near Angona's feet and told Officer Candelario "143 Adam," which is code for a gun being present on the scene. Officer Ugarte ordered Angona to exit the vehicle and he complied. Officer Ugarte patted Angona down for weapons, found no gun or other contraband. Angona and Foltin consented to a search of the vehicle. Angona was handcuffed and placed in the back of the officers' squad car. The search recovered no drugs or weapons. Angona was released after the vehicle was searched.

While Officer Candelario was standing by the passenger side of the car, Foltin made no furtive movements with her hands. At some point, Officer Candelario asked Foltin to exit the vehicle and she complied. She was wearing a lightweight summer dress. Officer Candelario did not observe any type of bulge on her person suggesting that she had a weapon. He also stated

4

that he could "tell that she didn't have no gun on her" and felt that a protective pat-down search was unnecessary. (Dkt. #162, Ex. 3, Candelario Dep. 86:21–22; 87:23–88:3.)[5] Nevertheless, Candelario and Ugarte felt they were permitted to do a pat-down of Folton, and Ugarte told Foltin that he was calling a female police officer to conduct a pat-down search. Officer Candelario believed a pat-down search was necessary, not out of concern for their safety, but "[j]ust in case" Foltin had any weapons on her and because it was "procedure to do a pat down to anybody that gets curbed in a vehicle." (*Id.* 108:5–12; 139:20–140:5).

Before Officer Candelario had an opportunity to radio for a female officer, three unidentified officers, including a female officer, arrived in a marked police car. The female officer asked either Officer Ugarte or Candelario whether they needed her to conduct a pat-down search and one of them said yes. The female officer took Foltin to the sidewalk and instructed her to put her hands on the hood of the police car. She then put her hands up Foltin's dress,

---

[5] Defendants object to this fact, but the evidence they cite in support of paragraph 17 of their statement of additional facts does not contradict Officer Candelario's testimony, which was as follows:

> Q: So for your safety and protection, you made a determination after [Foltin] stepped out of the car that [she] did not need to have a protective search done on her?
>
> A: A protective pat down, no.

(Dkt. #162, Ex. 3, Candelario Dep. 87:23–88:3.) Although the "no" response could mean "yes, the pat down was not needed" or "no, the pat down was needed," a few lines earlier Candelario's answer is more clear:

> Q: Did you feel a need at that point when she stepped out of the car for her to be searched?
> A: To be patted down?
> Q: Yeah.
> A. No.
> Q. Did Officer Ugarte say, Candy, we need to pat down Ms. Foltin?
> A. No.

(*Id.* 87:14–22.)

5

pulled out her bra, shook it and snapped it back.  Next, the female officer inserted two fingers into Foltin's vagina and motioned around and then went into her anal cavity with one finger and did the same.  The entire search took between one and three minutes. No weapons or contraband were recovered from Foltin.

Out of respect for Foltin's privacy, neither Officer Ugarte nor Candelario observed the search although, after the search, Officer Candelario noticed that Foltin was upset.  At all relevant times Angona and Foltin cooperated with the officers and did not offer any resistance. Angona and Foltin were released without charges or traffic citation.[6]

## ANALYSIS

Foltin argues that summary judgment is proper because the officers lacked reasonable suspicion to search her and, alternatively, even if reasonable suspicion existed, that the search exceeded the permissible scope of a pat-down search under *Terry*.

**I.      Whether the Defendant Officers Possessed Reasonable Suspicion Regarding Foltin**

The issue is whether there is sufficient evidence for a reasonable jury to conclude that the defendant officers had reasonable suspicion to suspect that Foltin was armed and dangerous

---

[6] Defendants make reference to the fact an aggravated vehicle highjacking incident occurred at approximately 5:30 p.m. that day and the officers were on the alert.  The police report states that the stolen vehicle was a 2003 gray Chevrolet Impala with temporary license plates. Officer Ugarte arrested that individual later that same night.  According to police records, Ugarte arrested the highjacker at 11:41 p.m. at 1050 East 80th Street. (Dkt. #162, Ex 13).  Although the arrest occurred in the same area of the city, defendants do not suggest any reason to suspect that Angona, Foltin or her vehicle was involved. Defendants only seem to imply that the reason they allowed Foltin and Angona to leave was because Officer Ugarte thought he spotted the stolen Impala.  Since probable cause to stop or arrest is not in issue here, these facts are not relevant.

when one or the other defendant officers directed the unknown female officer to do a pat-down search of Foltin.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches." U.S. CONST. amend. IV. In *Terry*, the United States Supreme Court held that a police officer may conduct a "reasonable search for weapons . . . where he has reason to believe that he is dealing with an armed and dangerous individual." 392 U.S. at 27. As such, "[d]uring a valid traffic stop, an officer may order the driver and passengers out of the vehicle . . . [and may] frisk the driver and any passengers upon reasonable suspicion that they may be armed and dangerous." *United States* v. *Tinnie*, 629 F.3d 749, 751 (7th Cir. 2011). A reasonable suspicion requires "more than a hunch but less than probable cause and 'considerably less than preponderance of the evidence.'" *Jewett* v. *Anders*, 521 F.3d 818, 823 (7th Cir. 2008) (quoting *Illinois* v. *Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)).

Determining "[w]hether an officer has a reasonable suspicion to support a *Terry* frisk is a fact-specific inquiry that looks at the totality of the circumstances in light of common sense and practicality." *United States* v. *Robinson*, 615 F.3d 804, 807–08 (7th Cir. 2010) (internal quotation marks omitted). The officer must have "some articulable suspicion that the subject is concealing a weapon or poses a danger to the [officer] or others." *United States* v. *Pedroza*, 269 F.3d 821, 827 (7th Cir. 2001). In determining the reasonableness of the suspicion, the court will consider the circumstances known to the officer at the time of the stop, including the experience of the officer, the behavior and characteristics of the suspect, and the time and location of the stop. *Tinnie*, 629 F.3d at 751–52.

Foltin argues that defendants did not have reasonable suspicion to conduct a protective pat-down search of her person. In support, Foltin notes that (1) Officer Candelario did not observe her make any furtive movements after he approached the passenger side of the car; (2) she was wearing a lightweight dress and Officer Candelario could tell that she did not have a gun on her; (3) Officer Candelario testified that he did not believe a pat-down search was necessary to protect his safety and the search was conducted only as a matter of "procedure;" (4) during the time Foltin was waiting for the female officer to arrive, Officer Ugarte searched Angona and no weapons were found; and (5) Foltin fully cooperated with the officers throughout the encounter.

Defendants argue that "the pat-down search for a weapon in this case was reasonable because it was late at night, in a high crime area, Plaintiff's vehicle was evasive and erratic, and the vehicle was full of debris." Defs.' Mem. at 8. That Officer Ugarte's concern that a gun might be on the floor board was not confirmed and that Angona had no gun on his person, according to defendants, only served to heighten their worry that Foltin might possess a weapon. *Id*. at 7.

Although this was a dynamic situation, the officers essentially have admitted that they had no articulable suspicion that Foltin was armed and dangerous but were using extra caution in performing the pat down of Foltin "just in case" a weapon might be found. *See Gentry* v. *Sevier*, 597 F.3d 838, 847 (7th Cir. 2010) (conducting a pat-down search as a matter of "routine" was insufficient to demonstrate reasonable suspicion). That the officers were patrolling in a "dangerous area in the middle of the night" may have justified their approach to the vehicle and their search of the vehicle. Once they found nothing on Angona, the occupants were out of the vehicle and Foltin was by all accounts merely standing aside, however, the evidence is consistent

8

with the officers' "just in case" justification rather than their lawyers' argument that "mounting suspicion" was the reason for the pat down or search of Foltin's person.

The argument that Angona "evaded" the officers is inconsistent with their testimony that Angona pulled over within about six car lengths in a matter of seconds. *Compare United States* v. *King*, No. 1:07-CR-104-TS, 2008 WL 4099112, at *6 (N.D. Ind. Sept. 2, 2008) (evidence that the target vehicle proceeded a block and a half before pulling over "supports an inference that one or both occupants of the vehicle were trying to buy time to conceal an illegal item in the car or gain access to a weapon"). And once the occupants were out of the vehicle, the messiness of the car has minimal, if any, bearing on whether Foltin was armed and dangerous. And although the officers observed unusual movement between the time they signaled Angona to stop and the actual stop, there is no evidence that the occupants' conduct, once they were in contact with the officers, was anything but compliant. *Cf. United States* v. *Williams*, 76 F. App'x 728, 730 (7th Cir. 2003) ("[A] defendant's 'furtive' movements during a traffic stop can justify reasonable suspicion.") (collecting cases); *King*, 2008 WL 4099112 at *7 ("Furtive movements of car occupants justifies conducting a protective search of the vehicle or taking physical control of the occupants.") (collecting cases); and *United States* v. *Kenerson*, 585 F.3d 389, 393 (7th Cir. 2009) (finding search reasonable where, *inter alia*, defendant made a furtive movement with his shoulders that made the officer concerned about the possible presence of a weapon in the car). Unlike these cases justifying a search based on furtive movements, here, the movements that concerned the officers while the car was moving came to an end at the moment the officers approached the curbed vehicle.

Finally, the fact that Cottage Grove Avenue in the 80s is a "high crime area" (although this assertion is not supported by evidence) standing alone is insufficient to support the *Terry* search. The dangerousness of an area can be a factor in the officers' judgment, but none of the cited cases indicates that this factor alone is sufficient to support a *Terry* search. *See, e.g.*, *United States* v. *Patton*, 705 F.3d 734, 738 (7th Cir. 2013) (the incidence of crime in an area is "one factor which, in conjunction with . . . other circumstances . . . contribute[s] to a reasonable suspicion that [an individual] might be armed") (collecting cases); *United States* v. *Brown*, 273 F.3d 747, 748 (7th Cir. 2001) (in addition to being in an area with "considerable criminal activity," the defendant was nervous, repeatedly glanced backwards, moved his hands in his lap area, could not produce a driver's license, had no identification, and appeared nervous and made a quick move when he complied with the officers' request to step out of the car).

Foltin is not suing because the officers pulled them over, ordered them out of the car, frisked Angona, placed him in handcuffs, and searched their vehicle. Rather, she contends that, in light of having taken these actions, there was no objective reason for the officers to believe Foltin was armed. *Compare United States* v. *Barnett*, 505 F.3d 637, 640 (7th Cir. 2007) (finding that "objectively reasonable suspicion did not dissipate during the roughly five minutes of questioning leading up to the frisk, regardless of [the defendant's] 'cordiality' or 'cooperativeness'" but noting that it would be "a different case if the officers' questioning had dispelled objectively reasonable suspicion of his commission of a crime that often involves weapons").

Without question, whether a frisk is "justified under *Terry* does not turn on [the officer's] subjective intent and perception of the facts" but on "whether a reasonable police officer . . .

would believe that [the individual] posed a danger to those in the immediate vicinity." *Patton*, 705 F.3d at 738; *see United States* v. *Uribe*, 709 F.3d 646, 650 (7th Cir. 2013) ("The officer's subjective motivations for stopping and detaining a suspect are not relevant to the reasonableness inquiry." (quoting *United States* v. *Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011))); *Tinnie*, 629 F.3d at 753 ("[I]t is . . . irrelevant that [the officer] testified that he frisks anyone he asks to step out of a vehicle during a traffic stop. The question is rather whether given all of the facts known to [the officer], a reasonable officer would have believed the frisk was justified.").[7] But the officers' subjective motivation is certainly relevant. In the cases giving rise to this doctrine, the officers subjectively believed they had reasonable suspicion of danger. Here, by contrast, Officer Candelario's subjective judgment was that a pat-down search was unnecessary, but he did it anyhow. It would make no sense for the court to strain to override his judgment on the basis that it was somehow not objectively reasonable.

Viewing these circumstances in the light most favorable to defendants, the court concludes that Foltin is entitled to summary judgment.

## II. Damages

This result does not obviate the need for a trial, however, because Foltin must prove her damages. Even though the City has been unable to identify and produce the female officer that conducted the search and the only witness to the search is Foltin herself, defendants contend that Foltin's allegation that a body cavity search was done is not credible. They assert, *inter*

---

[7] Foltin cites *Tinnie*, 629 F.3d 749, to support her position that the officer in question must subjectively believe that the suspect is armed to satisfy the reasonable suspicion required. The court does not read *Tinnie* to support Foltin's position, particularly in light of the Seventh Circuit's subsequent guidance in *Patton* and *Uribe*.

*alia*, that (1) a cavity search is inconsistent with police department policy and with the defendant officers' understanding of the type of search that the female officer was asked to perform, and (2) Foltin previously misidentified the female officer that searched her, thereby undermining her credibility as the sole witness to the search. Foltin argues that her testimony is unrebutted and must be accepted as true. Even if Foltin's testimony that she was subjected to a body cavity search is unrebutted, it is up to the jury to weigh and to believe her in whole, in part, or not at all. Defendants are entitled to test the credibility of her testimony. This case will be set for trial on damages. Disputes about admissible evidence may be addressed in the pretrial materials.

## CONCLUSION AND ORDER

For the foregoing reasons, plaintiff's motion for partial summary judgment (#156) is granted as to liability and denied as to damages. The parties are directed to engage in sincere efforts to settle this case and to report their progress at a status hearing to be held on August 1, 2013 at 8:30 a.m.

DATE: July 16, 2013                    ENTER: _____
                                                JOAN HUMPHREY LEFKOW
                                                United States District Judge